Let's begin with the first argument, United States v. Roberto Pabon. May it please the Court. It's your week. It's my week. I'm pleased to be back here again, Your Honor. Again, my name is Barclay Johnson. I'm an attorney with the Federal Defender's Office in Vermont. We represent Mr. Pabon. The essence of Mr. Pabon's claim is that following a series of searches, including an X-ray, that turned up no contraband and no evidence of wrongdoing, there was no probable cause to continue to hold him. That probable cause didn't exist at that point, we think, is underscored by the fact that the state court judge then refused to issue a warrant to hold Mr. Pabon for a CT scan. So at that point, the series of searches that had been done were of the driver. He had been physically searched with no result. The driver, again, Mr. Page, had been subject to a dog sniff with no result. Mr. Page had then been released. The car itself had been searched with no result. Mr. Pabon himself had been physically searched with no result. The chair in which Mr. Pabon had been sitting just before leaving for the hospital for his X-rays was sniffed by a dog, just as was done with Mr. Page, with no result. And two doctors said X-rays were negative and didn't show evidence of body packing. At this point, we think Mr. Pabon should have been released. And again, the absence of any probable cause is underscored by the state court judge's refusal to issue the warrant for the CT scan. What do we do if there was additional evidence that the officers still had in their possession after the doctor's opinion? The evidence that Page and Pabon had been stopped earlier, a dog had alerted to the car and to over $8,000 of cash in the car, his colleague's unusual history of renting cars that was consistent with late-night drug runs, and that there had been a positive alert to the car that evening to the passenger side door. They still knew that, and they had a doctor saying, I don't believe that there are drugs in his body, but also stating this can't be conclusive, this isn't conclusive,  Is that verdict by the doctor, is it clear that that dissipates probable cause? I think so, and I'll take the last one first. I think the statement is X-rays aren't 100% sensitive, but I don't think that has any bearing. I mean, X-rays are a medical diagnostic technology that's been used since the late 19th century. I think the court and all of us understand it's highly accurate, and the fact that it's not 100% sensitive goes both ways. It may not show every single instance of drugs being hidden in a body, but it's also going to show some drugs that, in fact, aren't there. I don't think that's a factor that weighs one way or the other. All the other information they have, we think, tends to dissipate, so they had some information about drug trafficking, they had an alert of the car, but then they searched the car, and they searched Mr. Page, and they searched Mr. Pabon, and they X-rayed Mr. Pabon, and they had a doctor who said it's not that it wasn't conclusive, but that the X-rays were . . . they had two doctors, a radiologist and an ER doctor, who said the X-rays were negative. The district court, in finding probable cause still existed, focused primarily on another trooper, Sergeant Albright, who the district court thought had extensive experience with body packing cases and who reviewed the X-ray and thought it showed drugs. But we would say when dealing with a definitive piece of medical evidence like an X-ray, it should never be appropriate to substitute law enforcement beliefs for an informed medical opinion. And even if you could, this isn't the case to do it. Mr. Johnson, before you said that X-rays, correct me if I'm wrong, if I misunderstood what you had said, that it didn't matter one way or the other what the X-ray results were, something to that effect. So which is it? We're supposed to regard the X-ray results as interpreted by a radiologist as dispositive? I hope I didn't say that, but we think the X-rays are dispositive here. The question had been, what of the statement that the X-rays were maybe inconclusive or not 100% certain? And all we're saying is this idea that X-rays aren't 100% sensitive, we don't think, weighs one way or the other. We know in general X-rays are a definitive piece of medical evidence. We've been using them for more than a century. Turning to Sergeant Albright, he didn't have extensive medical history with boggy packing cases. He'd seen and reviewed X-rays of suspected boggy packers only between 15 and 20 times over a 10-year span, mostly between 2000 and 2008. The radiologist, Dr. Rademacher, sees something like 20,000 X-rays a year. It turned out he was wrong, right? It turned out he was wrong, but he... We're still supposed to rely on his long expertise in this matter. It's not just him, though. He reviewed them. Another doctor reviewed them. And then we think there's no reasonable basis to accept, you know, the opinion of someone who's seen 15 to 20 over a 10-year period versus two neutral doctors. And I think the point's underscored by the fact that, you know, at a trial, Sergeant Albright would never be qualified as an expert witness on this unless he had vastly, vastly more training and experience. But you would have us develop a rule in which radiologists or other physicians' expertise or their training would be weighed by the court and that that would be the basis for a decision on something of this sort. I think in this case, I know that you need to develop a rule, but in this case it's clear, I think, that Sergeant Albright's belief can't trump the medical opinion of two neutral doctors. Could you address them? You argue also that there's a McLaughlin violation here. Yes. I think my time's about to run out, but I'm happy to start. So to emphasize the timeline, so Mr. Pabon is arrested at 1 a.m. on March 21st. There is an ex parte probable cause for arrest determination made some 63 hours later on March 23rd, but he then doesn't appear in court until March 26th. And we think this violates the plain rule, the bright line rule, really, set out in McLaughlin and Gerstein. The person's arrested without a warrant, he was arrested without a warrant, must promptly be brought before a neutral magistrate for a judicial determination of probable cause. We were to disagree with you that you have to be promptly brought before the magistrate, and we read those cases to say that what is required is a determination that there's probable cause for the arrest by a judicial officer. Is there still a McLaughlin violation here? I think so. We would urge you not to conclude that, but we're not saying that probable cause for arrest can't be ex parte as long as the defendant makes an appearance in court contemporaneously and within 48 hours. The problem here is that the ex parte probable cause for arrest finding comes 63 hours after his arrest, so well outside the line the Supreme Court has drawn, and then he doesn't make an appearance until three days after that. And the government argues, if I understand their argument correctly, that it's enough, we don't have to worry that it's over 60 hours before a magistrate focuses on the probable cause to arrest, to detain the person, because there is a search warrant that is obtained within seven hours or shortly after seven hours, and it amounts to the same thing. We disagree strongly. Look, probable cause for a search warrant is different than probable cause for arrest. But don't the different probable cause inquiries for searches and arrests essentially in this case overlap in a body packaging? I don't think in all cases they do. But a body packaging case like this one, don't the inquiries overlap? I don't think so, and I don't think the probable cause for a search warrant is what the Supreme Court had in mind. You can imagine a case where somebody has been forced to carry the drugs in their body. That person, there might be probable cause to search them, but there wouldn't be probable cause necessarily to arrest them. It's a different inquiry, probable cause for the presence of contraband or evidence of a crime versus probable cause that somebody has actually committed a crime. Mr. Johnson, about some other matters in the record, the district court didn't discuss the bathroom-related episodes in its opinion, but they're part of the record and presumably might have affected the behavior of the troopers. You recall that, right? Yes. He asked to use the bathroom, and then he was told that the water would be turned off, didn't go to the bathroom, and they were already suspicious, right? And then during that first visit to the hospital, he said he had to use the bathroom. Remember that? Yep. He was told he couldn't flush, and Trooper Hatch testified that he still attempted to flush, but that Hatch stopped any contraband from being destroyed. You recall that? Yes, except I think he said he looked and there wasn't any contraband. Right. Okay. But this is not a basis for suspicion or concern? Perhaps, but even if it is, I think what we have in the timeline is we have all this suspicion. We have a dog alert to the car. But then we have a series of searches of the driver, a sniff of the driver, a search of Mr. Pabon's person, a sniff of the chair where he was sitting, a search of the car, and then an X-ray of Mr. Pabon. So whatever suspicion those comments, actions tend to give, they're all dispelled by the fact that they do an X-ray of him, and two doctors say there's nothing there. Now, you have a motion to supplement the record? We do. Tell us about these documents. Were they ever brought to the attention of the district court? In a roundabout fashion, only because they came into existence well after the hearing and well after the opinion. These are, on the one hand, a memorandum preferring charges against Mr. Hatch, and on the other hand, a letter dismissing Mr. Hatch that were confidential. In the record, there is a counsel below explains our efforts to obtain them and our ability to obtain them only was successful once he appealed. He, Mr. Hatch, appealed the dismissal. What are we supposed to do with these? Well, we say and ask the court to receive them into the record because the court has the discretion to accept such evidence when there are materials that bear directly on the merits of the appellant's claim. And here, we think they bear directly on the actions and credibility of Trooper Hatch. Trooper Hatch was the prime mover in this case and the individual driving this case forward from the start. He's the one who interacts with, I mean, all the reports of Mr. Bohn's mysterious behavior come from Trooper Hatch. He's the one interacting with doctors. He's the one interacting with state court judges. But weren't all the complaints about Hatch available and disclosed prior to the suppression hearing and counsel didn't cross-examine Hatch on that? Yeah, we're certainly not saying the government withheld anything, but I think what was disclosed was the existence of two lawsuits against Mr. Hatch. And just as a matter of ability, probative value, cross-examining a state trooper about aren't there these two lawsuits against you is fundamentally different than saying hasn't your employer preferred charges against you for these numerous violations and hasn't your employer, in fact, dismissed you for these numerous violations, including for deceit and violating people's constitutional rights. It's just a fundamentally different thing. Thanks very much. Thanks. You've reserved some time. Mr. Perrella. May it please the court, my name is Joseph Perrella, and I represent the United States. It's a pleasure to be here from Vermont. The guiding principle of the Fourth Amendment is the mandate that law enforcement acts reasonably. The government contends the record here firmly establishes that law enforcement were reasonable in every respect. I'd like to first address the dissipation of probable cause versus what the government argues. Probable cause was being fortified or accumulating. First, the dueling doctors, Dr. Rademacher. The judges, Judge Murtha's finding that weighted the troopers' experience more than Dr. Rademacher was reasonable. It's important to put yourself in the hospital, which I believe the transcripts create this flavor. Dr. Rademacher admitted that he told the trooper that I can't be 100% certain that's what the signals the trooper was getting from Dr. Rademacher. Dr. Rademacher was focused on the fact the trooper said that drugs are usually bagged in condoms for body packing cases. Dr. Rademacher admitted it, and Trooper Hatch said that Dr. Rademacher said that he was looking for oval, elongated shapes, and so it threw him off when he just saw round shapes. Meanwhile, the troopers, including Trooper Albright, who has seen 15 to 20 over a 10-year period, they all know, and not even in x-ray cases, but in their general experience, they know that body packing cases, there's round bags as well as elongated. And so in that sense, they were reasonable to be a little bit skeptical about Dr. Rademacher's judgment, but they didn't just stop there. There was evidence that was accumulating, and by the way, as the record shows, Dr. Rademacher, the written report is much more certain than Dr. Rademacher's oral statements. So Trooper Hatch didn't read the written report until he got back to the barracks, and he testified, this doesn't really jive with what Dr. Rademacher told me. Because that written report was pretty definitive in tone, that there are no foreign objects in the body as I look at the exam, something to that effect. Correct, Judge Livingston. Can I ask, because that's where I'm starting to, that I have concern here about McLaughlin, because as I read McLaughlin and Gerstein, there is an obligation to have a judicial officer determine probable cause to detain within 48 hours. And in the language of McLaughlin, it said, examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest. And at the moment when they bring him back from the hospital and they read that report, and it says there's nothing there, maybe it's not that strong, but pretty close, they have other reasons to be suspicious. But it seems like what they set about to do is gather more evidence to go back and get another search warrant, and they're not thinking about can we keep detaining this person, and do we need a judicial officer to sign off on that? So I'm troubled by the fact that the McLaughlin inquiry doesn't take place until over 60 hours after he's detained. So why shouldn't I be troubled? Judge Livingston, you shouldn't be troubled because this is not just a free-for-all gathering evidence. This is gathering evidence pursuant to a search warrant, and a search warrant in this type of body packing case is for diagnostic testing. I think it's reasonable if there is a showing based on all the evidence that there's body packing, to wait until the suspect excretes those packages. And so there was a search warrant authorizing additional evidence here, but they didn't ‑‑ as Mr. Johnson said, and the state court judge, yes, said, I am not willing to sign a search warrant for a CT scan. And at that point in time, as Struper Hatch testified, he was going to release Mr. Pabon. But the intervening event was Mr. Pabon banged his head, was banging his head against a cell. He was at the doctor's. So he was at the hospital. He was on his way back from the hospital, and Struper Hatch testified, when he came back, I was going to release him. And then just a few minutes after that point in time, and that's important. That's in the record, Adjoint Appendix 190. Just a few minutes elapsed. There was no opportunity to release Mr. Pabon at that time. The additional information came in regarding Dr. Hartman, which ‑‑ and Struper Hatch put everything in the affidavit, including Dr. Rademacher's unequivocal statement in the written record, but also Dr. Hartman's statement that said this is equivocal. And also these other facts, and one is what I've categorized as the toilet tirades, which Judge Cabranes had alerted to, and those are significant facts, as is the alerts in the cell itself on the seat that Mr. Pabon was sitting at in the car. There was no alert on Mr. Page, the driver's seat. And Mr. Johnson tries to make a lot of hay out of the fact that no drugs are found. Of course no drugs are found because they're up. Mr. Pabon had stuffed them inside himself. That's why there were no drugs found. Let's say we were to agree with you that the officers ‑‑ I'm not saying I agree, but let's say we agreed that the officers acted reasonably throughout. Why isn't there a McLaughlin violation here, given that the magistrate did not determine that there was probable cause to detain this person until over 60 hours after his arrest? It would seem pretty implicit in a search warrant for diagnostic testing that you need to detain the person to do the diagnostic testing and then a reasonable amount of time thereafter to excrete. There's substantial overlap between the two inquiries, but can you cite any case where a judicial authorization on a search warrant has been taken to satisfy McLaughlin or Gerstein? I did not cite any cases in my brief. I cited a case for the proposition that the probable cause standard is higher, but the state government chose the less accusatory route of a search warrant rather than charging Mr. Pabon with a crime. The standard was the same, but they chose to be prudent and reasonable, to be certain. Fortunately, law enforcement and prosecutors don't just charge when there's PC. We want more evidence than that because it is a serious stigma to be charged with a crime, as I'm sure this court would agree. The fact that search warrants were . . . The evil that McLaughlin was trying to eliminate was detaining someone without any judicial oversight. There was multiple instances of judicial oversight here. In fact, at one point, Judge Cohen, the state court judge, said, I'm not going to sign that search warrant. They were preparing to release him, and within a few minutes, new evidence came in. I think that shows the reasonableness of the officer's action. The government contends that the McLaughlin case shouldn't be read to force us to charge someone as opposed to getting a search warrant. From this period, from about 245 to 415, 245 after they learned that the X-ray search was proven negative, they are seeking additional evidence to go back and get another search warrant. They are not preparing an affidavit to make sure that they have authority to continue to detain him. After Dr. Rademacher's findings, they were seeking additional evidence from Trooper Albright, who had much more experience. As I stated before, they had reason to be skeptical about Dr. Rademacher because he was focusing on shape, but that wasn't the only . . . There was evidence accumulating from the toilet behavior, from the dog searches, and the intervening event of bringing Mr. Pabon back to the hospital. So yes, the government argued that a doctor in this type of case isn't anointed the sole arbiter of probable cause. There's totality of circumstances, meaning all the circumstances, not just an X-ray, and we believe the continuing detention, therefore, was reasonable. Unless the Court has more questions, the government would rest on its brief. Thank you very much for your time. Mr. Johnson? The sole arbiter here is the neutral, detached magistrate, who, in this case, said, no, I'm not going to issue a search warrant because there is not probable cause. The government makes much of the round versus the long gigged issue. Right. When the magistrate says that, the testimony . . . the officers were going to release the defendant, but in the interim he had hit his head against the cell bars and had to be taken back to the hospital. Well, I don't know that he had to be taken back to the hospital. He could have been left there in the care of the physicians and released there amongst the doctors who were more than able to care for him, and that's what they should have done. Round versus a long gigged, Dr. Rademacher's testimony is clear. He wasn't just looking at round versus a long gigged. He's a radiologist. He's looking at the densities of objects. His opinion was more than reasoned. This is, as Judge noted, this is a paradigmatic example of the government holding someone to seek additional evidence, and it's, in fact, undisputed that that's what they were doing. They were trying to get more evidence. In terms of whether a probable cause to issue a search warrant or probable cause for arrest, the government wants to have it both ways. If it's going to be probable cause for a search warrant, there's a logical problem here, because although a search warrant was issued for the X-ray, a search warrant was then denied for the CT scan. It can't be both ways, and that's among the reasons why that standard can't govern. At the same time they sought the first search warrant, a determination that there was probable cause for the detention, the judge would clearly have said there's probable cause for the detention, right? I don't know, quite honestly, in this case. He didn't. They didn't ask for that, and it's, as we've said, a different standard. Thereafter, though, all these searches come back negative, including the X-rays. In terms of McLaughlin . . . Are you aware of any other cases involving body-packing detentions? There are a lot of cases that occur at the border, but did it have occurred in the interior that raised this issue about detention, the passage of time, and the need for medical exams and so forth? No, not off the top of my head. We'd be happy to look for those if the court thought that was helpful. We think suppression is the remedy here. There's no reason to distinguish this Fourth Amendment violation from other Fourth Amendment violations, and we think the purpose of the exclusionary rule is furthered here, and that's among the reasons why the additional documents are, we think, probative. They go to Trooper Hatch and his pattern of violating constitutional rights and deceit. I think this is a case where exclusion will further deter government bad acting. Thank you very much. We'll reserve the decision.